**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Omar Toure,<br><br>Petitioner,<br><br>vs.<br><br>James Saylor,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER GRANTING MOTION TO DISMISS AND DISMISSING PETITIONER'S HABEAS PETITION**<br><br>Case No. 1:20-cv-197 |

Petitioner Omar Toure ("Toure") is an inmate at the North Dakota State Penitentiary ("NDSP") in Bismarck, North Dakota. On November 6, 2021, he filed a "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody." On November 14, 2021, Respondent filed a Motion to Dismiss. For the reasons set forth below, Respondent's motion is granted and Toure's habeas petition is dismissed.

## I. BACKGROUND

Toure emigrated from Senegal, West Africa, to the United States. (Doc. No. 18-18, p. 314). He has been residing in the United States for the better part of two decades. (Id.). His native language is Wolof. (Doc. No. 18-33). English is his second language. (Id.).

In April 2015, Toure was charged in Williams County Case No. 53-2015-CR-00769 with three counts of terrorizing. (Doc. No. 18-1). He was also charged in Williams County Case No. 53-2015-CR-00770 with two counts of reckless endangerment. (Doc. No. 18-6). Finally, he was charged in Williams County Case No. 53-2015-CR-00711 with kidnaping and aggravated assault. (Doc. No. 18-10).

Toure's three cases were consolidated for trial. (Doc. No. 18-15, pp. 31-22). Toure was

initially represented by attorney Jonathan Green, and, when the state district court granted attorney Green leave to withdraw, by attorney Kevin McCabe through trial.  (Doc. No. 18-32).

At the close of Toure's preliminary hearing on June 5, 2021, when responding to the court's inquiry about the estimated length of trial, attorney Green advised additional time would be required as a "[w]e're going to need an interpreter for my client."  (Doc. No. 18-15, p. 32).  The court responded that it would address a request for an interpreter at an upcoming scheduling conference with the parties.  (Id. at p. 33).

Green would made some inquiries about obtaining the services of an interpreter on Toure's behalf but not necessarily at Toure's direction during the course of his representation of Toure. (Doc. No. 18-18).

On August 18, 2015, attorney Green filed a motion to withdraw.  (Doc. No. 18-1).  On October 27, 2015, the state district court held on hearing on attorney Green's motion. (Doc. No. 18-41).  A Wolof interpreter appeared and participated in a hearing by telephone.  (Id.).   In the days that followed it granted the motion and appointed attorney McCabe as substitute counsel.  (Doc. No. 18-1).

Toure's consolidated cases went to trial on October 19, 2016.  (Doc. No. 18-16 through 18-19).  At the pretrial counsel, attorney McCabe requested that the court instruct witnesses to speak slowly and clearly as Tour "[did] not speak the best English." and that "[w]e are giving up our right to have an interpreter here. . . . " (Doc. No.  18-16, p. 12).

At the conclusion of the trial, the jury convicted Toure of two counts of terrorizing, one count of reckless endangerment, kidnaping, and aggravated assault.  (Id.). The court subsequently sentenced him to a term of 10 years imprisonment for the kidnaping and concurrent terms of 5 years

imprisonments on the other four counts/offenses for which he was convicted. (Id.).

Toure directly appealed his convictions on the grounds of insufficiency of the evidence and denial of his right to a speedy trial. (Doc. No. 18-23). He was represented by attorney Laura Ringsak. (Doc. Nos. 3 and 18-23).

The North Dakota Supreme Court consolidated Toure's appeals. (Doc. No. 18-21). On November 16, 2017, it issued an opinion summarily affirming Toure's convictions. (Doc. No. Doc. No. 18-21 and 18-23). It's mandate issued on December 18, 2017. (Doc. No. 18-21). Toure did not petition the United States Supreme Court for a writ of certiorari. (Doc. No. 3).

Toure filed an application for post-conviction relief with the state district court on February 9, 2018. (Doc. No. 18-25). The state district court dismissed the application without prejudice on March 26, 2018. (Id.).

Toure filed a second application for post conviction relief on May 8, 2018, asserting, among other things, that trial counsel was deficient in that he did not move to suppress an interview of Toure by a law enforcement officer without an interpreter present, that trial counsel was deficient in that he failed to ensure that Toure had an interpreter at trial, and that appellate counsel was deficient in that the failed to raise as an issue on direct appeal Toure's lack of an interpreter at trial. (Doc. Nos. 18-26 through 18-28).

The State moved to dismiss Toure's second application. (Doc. Nos 18-29 and 18-30). The state district court convened an evidentiary hearing on November 21, 2021. (Doc. No. 18-32). A Wolof interpreter was present to translate for Toure. (Id.). Toure testified as did attorneys Green and McCabe. (Id.). Following the hearing, the state district court issued an order denying Toure's application. (Doc. No. 18-33). It did not find Toure's assertions regarding his lack of proficiency

in English and need for an interpreter to be particularly credible, opining:

>  [¶7] Toure alleges that he is a non-English speaker and is entitled to an interpreter. He alleges that since no interpreter was provided during his interview with law enforcement or at trial his counsel was ineffective.
>
> [¶8] A criminal defendant has a state and federal constitutional right to a fair trial. State v. Hidanovic, 2008 ND 66, 126,747 N.W.2d 463. Rule 28 of North Dakota Rules of Criminal Procedure requires that an interpreter must be provided to a person with limited English proficiency.
>
> [¶9] If Toure was of limited English proficiency, the failure to provide an interpreter at trial would be a violation of N.D.R.Crim.P. 28. Not having an interpreter would also substantially affect Toure's right to counsel, his right to participate in his own defense, and his right to understand the proceedings. If an attorney failed to have an interpreter provided for a defendant with limited English proficiency, such failure would fall below objective norms and result in substantial prejudice to the Defendant.
>
> [¶10] Ultimately, the issue of the assistance of an interpreter comes down to the factual determination of whether or not Toure is proficient in speaking and understanding English. If Toure cannot speak and understand English, the failure to have an interpreter at trial and the failure to move to suppress the interview would be ineffective assistance of counsel. If Toure can speak and understand English, then an interpreter is not necessary and there is no ineffective assistance of counsel. It is Toure's burden to prove that he was unable to speak and understand English.
>
> [¶11] Toure is originally from Senegal, Africa. He immigrated to the United States approximately 19 years ago and has resided in the United States since that time. His native language is Wolof. English is a second language for Toure.
>
> [¶12] The evidence in the record indicates that Toure can speak and understand English. Toure testified at trial, at length. The questions were given to Toure in English and Toure responded in English. Although at times Toure's trial testimony is nonresponsive, Toure never indicated there was an issue with the testimony being given in English without the aid of an interpreter. At the evidentiary hearing in this matter, with the aid of a Wolof interpreter, Toure on occasion gave nonresponsive answers. At the evidentiary hearing, Toure gave answers or responded before the translator could translate the proceeding, indicating that Toure understood the English language portion of the proceeding without the need for an interpreter. At the evidentiary hearing, the State showed video of an interview law enforcement conducted with Toure. In the video, Toure is questioned in English and he answers in English. Toure speaks English with an accent, but the Court had no difficulty in understanding Toure in the video and in the courtroom when he spoke in English.

> The video of the interview indicates that Toure is able to speak and understand English. Both Attorneys Green and McCabe testified that although there was some difficulty in communicating with Toure due to English being his second language, both attorneys felt that Toure was able to communicate with them both in English.
>
> [¶13] In support of his argument that he is not proficient in English, Toure offered an "individual report" indicating that Toure has beginning English literacy. There was little background regarding the "individual report," other than it shows the results of testing that Toure underwent at the state penitentiary. It appears the results indicate that Toure is not able to read and write in English proficiently. However, the issue in this matter is Toure's ability to understand spoken English and to speak in English. The record reflects that he can do so, regardless of his ability to read or write in English. Toure has not proven that he is unable to understand and speak English.

(Id.). Its decision was summarily affirmed on direct appeal by the North Dakota Supreme Court. (Doc. No. ).

Toure initiated the above-captioned action pro se on October 28, 2020, with an incomplete "habeas packet." (Doc. No. 1). On November 6, 2020, he filed an application to proceed *in forma pauperis*, which this court granted, along petition for a writ of habeas corpus setting forth the following grounds for relief:

> GROUND ONE: Ineffective Assistance of Counsel
>
> * * *
>
> Neither my first or my second attorney secured me an interpeter for trial when they know I needed one. My second attorney (Kevin McCabe) waived my right to have one. Because of this I did not have a fair trial. Also failed to conduct an adequate pretrial investigation concerning evidence and witness credibility.
>
> * * *
>
> The record as a whole reflects my need for an Interpreter. Not only did I need an Interpreter during court appearances bugt also during telephone communications with my attorney.
>
> * * *
>
> GROUND TWO: Ineffective Assistance of Appellate Counsel.

* * *

> Due to not having a Interpreter to help articulate my concerns I had except the fact that the attorney responsible for my direct appeal did not raise all issues that needed to be raised.

(Doc. Nos. 2, 3, 6).

On January 14, 2021, respondent filed Motion to Dismiss Toure's habeas petition. (Doc. No. 16). Toure has yet to file a response to the motion. See D.N.D. Civ. L.R. 7.1(F) (An adverse party's failure to serve and file a response to a motion maybe deemed an admission that the motion is well taken.").

## II.  GOVERNING LAW

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in custody in violation of the United States Constitution or other federal law. However, where the state court has adjudicated the federal claim on the merits, this court's review is limited by 28 U.S.C. § 2254(d) to a determination of whether the state court's decision is (1) directly contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d); see generally Harrington v. Richter, 562 U.S. 86, 97-100 (2011) ("Richter"); Williams v. Taylor, 529 U.S. 362, 399-413 (2000). This highly deferential standard of review is often referred to as "AEDPA deference" because it was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). E.g., Pederson v. Fabian, 491 F.3d 816, 824-25 (8th Cir. 2007); see generally Renico v. Lett, 559 U.S. 766, 773 n.1 (2010). The reasons for the limited review are ones of federalism and comity that arise as a consequence of the state courts having primary responsibility

for ensuring compliance with federal law in state criminal proceedings. See, e.g., Richter, 562 U.S. at 103.

Also, for the same reasons, the review under § 2254(d)(1) is limited to the record that was before the state court and does not permit consideration of new evidence. Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011).

## III. DISCUSSION

### A. Issue regarding Toure's English Proficiency and the Lack of an Interpreter at Trial

The essence of Toure's claims for ineffective assistance of trial and appellate counsel is that, due to his limited proficiency in English and counsels' failure to secure an interpreter for him, he was unable to communicate effectively, did not fully to comprehend everything that was occurring during the course of his criminal proceedings, and did not receive a fair trial. (Doc. Nos. 1-7). As both claims concerns his English proficiency or lack thereof, the court shall address them together.

Respondent moves to the dismiss Toure's claims in their entirety. First, he asserts that the state courts' application of law to the facts was objectively reasonable and that their findings are entitled to great deference. Second, he asserts that the Toure's acquittal on two of the seven counts with which he was charged belies his assertion that he had communication issues with trial counsel and that trial counsel was ineffective. Third, he asserts that Toure has overstated or exaggerated his communication difficulties as the record amply reflects an ability on his part to understand and converse in English.

Under Strickland v. Washington, 466 U.S. 668 (1984), a defendant who claims ineffectiveness of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defendant. In regard to this analysis the Court explained

in Strickland that:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [any particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Id. at 697.

The test for deficient performance under the "first Strickland prong" is whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688; Rompilla v. Beard, 545 U.S. 374, 380 (2005). When the issue involves a matter of trial strategy, there is a strong presumption that the strategy was sound and was not ineffective assistance. See Bell v. Cone, 535 U.S. 685, 698–702 (2002).

Under the "second Strickland prong," prejudice is only shown when there is a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" E.g., Woodford v. Visciotti, 537 U.S. 19, 22 (2002) (per curiam) (quoting Strickland, 466 U.S. at 694 and adding emphasis). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 23 (quoting Strickland, 466 U.S. at 694).

Judicial scrutiny of counsel's performance is highly deferential. Strickland, 466 U.S. at 687-88. Counsel's decisions are presumed to represent "sound trial strategy;" "[f]or counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." Boyd v. Ward, 179 F.3d 904, 914 (10th Cir.1999) (internal quotations omitted).

When a state court has addressed a petitioner's ineffective-assistance of counsel claims on the merits and applied the Strickland test, a federal court must accord the state court's determination

the deference required by 28 U.S.C. § 2254(d). Rompilla, 545 U.S. at 380.  Assuming there are no issues with respect to the state court's findings of fact, the federal court's review is limited to the determination of whether the habeas petitioner has met the burden of proving that "the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford, 537 U.S. at 25; see also Rompilla, 545 U.S. at 380. The Supreme Court has characterized the application of the Strickland standard through the prism of AEDPA as amounting to a "doubly deferential" standard of review. E.g., Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

In rejecting Toure's claims of ineffective assistance of trial counsel, the state district court relied upon the record of Toure's underlying criminal proceedings, the evidence introduced at the post-conviction evidentiary hearing, and its own observations of Toure during the post-conviction evidentiary hearing. (Doc. No. 33).  The district court found it telling that Toure was able to converse comprehensibly in English when interviewed by law enforcement and later when testifying at trial and that Toure did not wait for a translation from the interpreter when responding to questions posed to him at the post-conviction evidentiary hearing. (Id.).  It also found it significant that neither of the attorneys appointed to represent defendant at trial reported there being a language barrier per se.  (Id.).

In view of the foregoing, it cannot be said either the state district court's denials or the North Dakota Supreme Court's affirmance of the district court's denial of these claims were an unreasonable application of Strickland - particularly given the great amount of deference that must given to resolution of claims of ineffective assistance of counsel by the state courts.  In a federal habeas corpus proceeding, the factual findings of state court are presumed correct, and may be set aside only if not fairly supported by the record. Purkett v. Elem, 514 U.S. 765 (1995); 28 U.S.C. §

2254(d). Here, the state courts' factual determination regarding Toure's English proficiency has ample evidentiary support.

Toure's aforementioned interview with law enforcement was captured on video. (Doc. No. 19). Respondent filed a copy of this video recording as an exhibit in support of his motion to dismiss. (Id.). In this recording, Toure can be seen and heard conversing with a law enforcement officer in English. (Id.). At the outset of the interview Toure assured the officer that he understood his rights as they had been explained to him. (Id.). He then proceeded to discuss at some length his background and the events that had brought him to North Dakota and had culminated in the conduct giving rise to the charges for which he would later be convicted. (Id.). During the course of the interview, he did most of the talking. (Id.). When asked questions, he formulated responses quickly and without any apparent difficulty. (Id.). At no point did he advise the officer that he was having any trouble speaking English or otherwise understanding her. (Id.).

Toure testified at trial. (Doc. Nos. 18-18 and 18-19). The transcript of his testimony does not reflect any overt expression by him of any insecurity regarding his English proficiency or lack therefore. (Id.). Moreover, it does not reflect that he communicated to the state district court any concern or reticence about his ability to understand what was being asked of him or what was transpiring around him. (Id.).

Toure also testified at the post-conviction evidentiary hearing, this time with the aid of an interpreter. As noted above, the court observed that Toure did not always wait for a question to be translated before answering the questions asked of him. It is also worth noting that the record of this hearing reflects that Toure did not completely understand the Wolof interpreter.

Attorneys McCabe and Green testified at this same hearing. Attorney McCabe reported that he did encountered some difficulties communicating with Toure but that Toure could understand

English.

> Q. And were you able to communicate with him?
>
> A. I was.
>
> Q. Okay. And what do you mean by you were able to communicate with him.
>
> A. Well, Mr. Toure is from, obviously, another country and he had–there's just a language– I woudn't call it a barrier, but he did speak with an accent. He just spoke very slowly, very quietly, but I believe we had a good understanding of each other as we were communicating.
>
> * * *
>
> Q. Okay. I don't know how far we need to go into those, but were you able to engage in a legal conversation with him about the questions regarding the charges and the answer that you gave him?
>
> A. We were.
>
> Q. All right. Did he ever indicate that there was anything in the charging documents or the discovery or stuff like that he didn't understand?
>
> A. He did. He stated that he didn't understand why he was being charged in the first place or what he did was wrong. And I explained to him what the State's position was and why the State feld that it was wrong that he did what he did.
>
> Q. Basically, the thing he didn't understand is, why the State felt he committed a criminal act?
>
> A. Correct.
>
> Q. All right. Now, did you, during the course of these discussions, get an impression that he had no understanding of the English language?
>
> A. No. He understood the English language, but he wasn't what I would consider extremely fluent. But he understood the English language.

(Doc. No. 18-18, pp. 78-79). Attorney Green testified that cultural differences as opposed to an inability to understand English that was the primary cause for the deterioration of their relationship.

> Q. So you had indicated that you had met with Mr. Toure and you had discussed discovery with him?

A. We did have conversations about discovery.

Q. Okay. Do you also discuss the charges, the legal basis for those sort of things?

A. We did have conversations about the charges, yes
.
Q. Or did he have any questions about this stuff?

A. Mr. Toure had may questions about this stuff.

Q. Okay. And kind of generic, what was he wondering about and what did you do to address those questions?

A. Mr. Toure struggled to understand the charges against him. I think he, initially, at the onset, didn't understand why there would even be charges against him. To me it initially seemed that there was a significant cultural barrier. I couldn't really tell if that he didn't understand our legal system or if he didn't understand what I was talking about. I think it may be it was a combination of both.

Q. Did he have the kind of attitude that he shouldn't have been charged for this, period?

A. Yes. That was–to me, that was the cultural barrier that I was trying to get through, was that–I was getting the impression that in his culture, that this was something that would be okay.

THE COURT: Can I ask a question just to clarify the last answer.

MR. MADDEN: Yeah.

THE COURT: When you say, Attorney Gree, "Well I wasn't sure if he was understanding what I was talking about", are you saying becuse he couldn't understand English or are you saying becuase he douldn't understand English or are just syaing he couldn't understand the concepts that you were providing to him, even though he could understand English.

THE WITNESS: Both.

BY MR. MADDEN:

Q. Now, didn't we offer, "we" being the State – did the State offer interpretive services through the Court to Mr. Toure to communicate with you.

A. There was – it my recollection that interpreter services were offered on my motion to withdraw at that particular hearing. I think we had had a preliminary

hearing and a disposition conference already, and I didn't believe I had an interpreter at those.

Q. Was Mr. Toure able to proceed with those?

A. We did proceed through those. I guess we made it through it.

Q. Well, I guess what I'm saying is, is that as far as interpreter services go, did he request an interpreter for those hearings?

A. Well, I'll go outside the scope of your question. Mr. Toure didn't ask for an interpreter. I had spoken with the Commission on Indigent Defense a number of times about getting an interpreter. I don't recall if it was specifically for this particular case, but I had had other cases. The response from the commission was that I needed to pay for the interpreter services and that they would reimburse me and that I could not use any of their – they had some sort of code that they would use, and I was unwilling to do that.

Q. At the motion to withdraw hearing did the Court make its interpreter services available?

A.  . . . But to my recollection, that the motion to withdraw, I think we did get somebody on at the motion to withdraw that spoke Wolof. If I remember correctly – this has been awhile ago – this was in 2015 – I don't know if there's dialects of Wolof, or not, but Mr. Toure couldn't completely understand that interpreter.

A. So we actually had a Wolof interpreter on the phone interpreting for Mr. Toure?

A. Yeah. If that's –

Q. And he didn't understand what was going on?

A. He didn't understand that particular interpreter, is my recollection.

* * *

Q. And then your testimony was basically, it was that he had both cultural and language difficulties.

A. Yeah. And the cultural difficulties, I believe, is what really resulted in me having to withdraw. Mr. Toure was becoming extremely angry with me. He felt like I wasn't understanding his position. Even though I fully understood his position, he didn't fully understand my position.

Q. Okay. Do you think part of that may have been language as well?

A. I've already stated that it was both cultural and language.

* * *

Q. Did you feel that Mr. Toure did not want to understand?

A. I don't think Mr. Toure didn't want to understand. As I mentioned, there was a cultural barrier here. And I think getting over that hurdle with Mr. Toure, especially since I was the initial attorney, all of this hadn't – I've dealt with this before. It doesn't sink for quite a while, that I'm in a predicament that I am in and that I'm here for a reason. To him, he was there for no reason.

Q. I gotcha.

A. And getting through, over that cultural hurdle – well, was creating a lot of anger in Mr. Toure to the extent that I felt he didn't – it wasn't going to be productive for me to serve as his attorney anymore. Maybe getting a second opinion and having someone else come in and work on the case —

Q. Okay. But it wasn't – you dind't feel that he was refusing to understand.

A. No. I got the impression that his culture has made it seem like I shouldn't be here.

(Id. at pp. 100-108).

At his sentencing, Toure exercised his right of allocution and spoke to the court in English about his background, his family, and his case. (Doc. No 18-20). In so doing, he did not overtly express any confusion or lack of comprehension of what others had said, what had transpired, and what was currently transpiring. (Id.).

Notably, Toure has presented nothing lending credence to the proposition that he did not understand the proceedings, was unable to effectively communicate with counsel, that his attorneys' performance was objectively unreasonable, and that he suffered prejudice as a result. Rather, the record reflects that counsel, while sensitive to the fact Toure was not a native English speaker, felt that they could effectively communicate with Toure and did not necessarily have to go through an interpreter and that Toure's feelings were mutual. The record also evinces that Toure can understand

and speak English.

On the current record, the fact that counsel did not demand assistance from and the presence of a interpreter in during pretrial proceedings in general and at trial in particular, while not necessarily ideal, does not appear to be objectively unreasonable given Toure's demonstrated proficiency in English. Because Toure has the burden of proof, the denial of Toure's ineffective assistance claim based on insufficiency of the evidence to demonstrate the requisite lack of English proficiency on his part, an inability to communicate with counsel, and an inability to comprehend is not an unreasonable application of Strickland. Consequently, these claims of ineffective assistance of counsel fail.

**B. Pretrial Investigation and Witness Credibility**

Toure's claims for ineffective assistance of counsel as it pertains trial counsels' alleged failure to conduct an adequate pretrial investigation or to test the witnesses' credibility also fails. First, his assertions regarding the adequacy of counsel's pretrial investigations and/or preparations is conclusory. He fails to elaborate exactly how or why counsel's pretrial investigations were inadequate. He likewise fails to identify exactly which witnesses he believed lacked credibility much less articulate how counsel's examination of these witnesses were deficient. Consequently, he has not established that counsel's performance fell below an objective standard of reasonableness. Moreover, he has not demonstrated that but for the alleged deficiencies of counsel the result of the proceeding would have been different.

## IV. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also, United States v. Lambros, 404 F.3d 1034, 1036 -1037 (8th Cir. 2005); Garrett v. United States, 211 F.3d 1075, 1076-77 (8th Cir. 2000). In this case, Toure has not demonstrated that reasonable jurists would disagree with the foregoing assessments. Consequently, this court will not issue a certificate of appealability to him.

## V. CONCLUSION

Respondent's Motions to Dismiss (Doc. No. 16) is **GRANTED** and Toure's habeas petition (Doc. No. 3) is **DENIED**. The court certifies that an appeal from the denial of this motion may not be taken in forma pauperis because such an appeal would be frivolous and cannot be taken in good faith.. Accordingly, the court shall not issue Toure a certificate of appealability

**IT IS SO ORDERED.**

Dated this 7th day of February, 2022.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court